Carstens Packing Co. v. Sterne & Son Co., 210 Ill. App. 26.

---

# Carstens Packing Company, Appellee, v. Sterne & Son Company, Appellant.

## Gen. No. 23,222.

1. BROKERS, § 25*—*when warranty of quality of turkeys shown.* Evidence as to the quality of certain turkeys purchased by defendant for plaintiff, held insufficient to show or tend to show a warranty by defendant of the quality, in an action by the principal against the broker purchasing the poultry.

2. BROKERS, § 25*—*when broker's note is evidence of contract for purchase of poultry.* A "broker's note" made by defendant and forwarded to plaintiff, making a full and complete disclosure of the terms of a certain contract between plaintiff and defendant for the purchase by defendant for plaintiff of certain turkeys, constituted exclusive evidence of such contract.

3. BROKERS, § 25*—*when ratification of contract for purchase of poultry shown.* Evidence held to show a ratification by plaintiff of defendant's contract for the purchase by defendant for plaintiff of certain turkeys, irrespective of the quality of the turkeys as regarding defendant's warranty of the quality, in an action to recover for inferior quality of the turkeys.

O'CONNOR, J., dissenting.

---

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Carstens Packing Co. v. Sterne & Son Co., 210 Ill. App. 26.

Appeal from the Municipal Court of Chicago; the Hon. SHERIDAN E. FRY, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1917. Reversed with finding of fact. Opinion filed March 13, 1918. Rehearing denied March 25, 1918.

ROSENTHAL, HAMILL & WORMSER, for appellant; CHARLES H. HAMILL and HARRY MARKHEIM, of counsel.

FREDERICK A. BROWN, for appellee; RAYMOND S. PRUITT and JESSE J. HERR, of counsel.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

This is an appeal by Sterne & Son Company (defendant) from a judgment—after a jury trial—in the sum of $1,648.33, entered in the Municipal Court in favor of Carstens Packing Company (plaintiff).

On December 11, 1911, the plaintiff filed a statement of claim "for damages for a breach of a brokerage contract, whereby on or about October 28, 1910, defendant agreed to buy for plaintiff at a given price, a carload of turkeys to be shipped to plaintiff at Tacoma, Washington, promising that the same would be of choice quality"; that "defendant  *  *  * bought of the United States Packing Company, and had shipped to plaintiff at said price, a carload of turkeys, but did not require said seller to furnish turkeys of choice quality"; that they were "in fact of inferior quality, worth in the market $2,060.68 less than they would have been if of the quality agreed upon." The defendant, in its affidavit of merits, denied that it promised the merchandise would be of choice quality or that it agreed that it would require the United States Packing Company to furnish turkeys of choice quality; denied indebtedness; denied that the turkeys were of inferior quality and worth less than the market price of turkeys of the quality bought by the plaintiff.

The history of the trials in this cause shows the following: (first trial) the jury discharged on motion of the plaintiff; (second trial) a juror withdrawn on motion of the plaintiff and the cause continued; (third trial) a verdict for the plaintiff in the sum of $600, which, on motion of the defendant, was set aside and a new trial granted; (fourth trial) a disagreement of the jury; and (fifth trial) the judgment here appealed from.

On October 18, 1910, plaintiff, at Tacoma, wrote to the defendant, "Could you inform us as to the best place to buy turkeys, or where you think they are the cheapest and the fattest? Can you give us the names of some reliable dealers in Kansas, or wherever they are?" On October 22, 1910, defendant wrote the plaintiff that it had taken the matter up with several of the local people, and that they had found a concern in Chicago which had "a number of places through Missouri, Kansas and Nebraska, from which they could ship to the coast." The letter further stated: "If you will give us specifications of your requirements for a car, we will be pleased to take the matter up with these people and purchase these turkeys for you. We would want it strictly specified as to just what you want and we will see to it that the shippers fill your order in accordance with your directions. The writer has had some experience in handling poultry and we believe that we could handle this deal for you and obtain the brokerage from the sellers, and, at the same time, get the turkeys for you just as you could get them yourselves. Therefore, if you will comply with our suggestions, we will be pleased to go into the matter and advise you as to just what price we can get a car delivered Tacoma for you." On October 26th the defendant sent a telegram stating that they found Texas was the best place to buy Thanksgiving turkeys and that they could get a car from there for shipment in time for the Thanksgiving

trade. "Advise ordering immediately as market likely to go higher Thanksgiving approaches; these guaranteed choice fresh birds." That telegram was confirmed by a letter of October 26, 1910, in which letter it was stated: "The offer we have is only for a day or two and we feel that the market is likely to go higher. The Chicago market, at the present time, is about 20 cents on turkeys, but a very poor selection of birds could be purchased at that price and the ones that we are offering you are guaranteed choice quality. We hope to hear from you giving us an order for this car." On October 28, 1910, the defendant telegraphed the plaintiff, "Can use one or two cars frozen turkeys as per your telegram." On October 29, 1910, defendant telegraphed the plaintiff that it had booked one car turkeys which would be "thoroughly chilled to temperature of car, shipped in barrels  *   *   *  Wire City National Bank, Wichita Falls, Texas, that draft will be paid. Answer." On the same day the plaintiff wired the defendant that the "birds must be choice and routed Burlington and N. P." In the letter of October 29, 1910, the defendant wrote that upon receipt of plaintiff's order they called up "the parties offering the turkeys and ascertained from them that these are thoroughly chilled before putting into the iced car, and that they would guarantee their condition for shipment to the coast  *   *   *.  Shippers also requested us to wire their bank at shipping point that draft will be paid. They were not acquainted with you and thus their reason for asking this. We find we omitted in our wire to state who would be making the draft and for your information will say that this is the U. S. Pkg." In that letter was also inclosed and sent to the plaintiff the defendant's memorandum referred to as a "Broker's Note," which is as follows: "Carstens Packing Co., Tacoma, Wash. We have sold you for account of United States Packing Co., 22-5th Ave., Chicago, one

(1) car dressed turkeys in barrels, 65% young toms, 35% hens. Price 20½ per pound, f.o.b. Texas shipping point. * * * Inspection: Guaranteed fresh packed stock, to be properly chilled and shipped in properly refrigerated car. Brokerage: Sellers." Upon the back of the broker's note there was stamped, "Rec'd Nov. 1, 1910, Carstens Packing Co., 3:20 o'clock." A corresponding note was sent by the defendant to the United States Packing Company, which recited, among other things, that the defendant had sold, for the account of the United States Packing Company to the plaintiff, the property in question and that the defendant's commission was 3¾ per cent. Some further correspondence took place between the plaintiff and the defendant on the subject of further purchases of turkeys by the plaintiff. On November 1, 1910, the City National Bank, Wichita Falls, Texas, sent a telegram to the plaintiff: "Answering wire. Guarantee must be from a bank and for a draft up to certain amount not specifying the kind of turkeys. We have no means of knowing whether turkeys are choice or that they would meet your grades. Understand draft to be made by United States Packing Company."

On November 2, 1910, plaintiff, by letter, requested the National Bank of Commerce of Seattle to wire the City National Bank of Wichita Falls, Texas, that it would guarantee the draft of the United States Packing Company for $5,000 on the defendant for turkeys. The National Bank of Commerce, accordingly, wired the City National Bank as directed. Two days later, on November 4, 1910, the defendant wired plaintiff, requesting it to wire the City National Bank at Wichita Falls that they would honor the draft of the United States Packing Company, which telegram recited further: "This is new bank they are dealing with and bank wants explicit instructions. Expect get car started tomorrow. Quality guaranteed."

The United States Packing Company, on November 10, 1910, at Wichita Falls, Texas, drew on the plaintiff at Tacoma, for the sum of $4,123.12, to the order of the City National Bank. Attached to the draft was a bill of lading covering the shipment, which acknowledged the receipt of the turkeys at Greensville, Texas, on November 9, 1910. The draft, going through various banks, was finally paid on November 23, 1910.

The turkeys were received in Tacoma, November 22, 1910, and on the following day plaintiff wired the defendant: "Turkeys poor * * *. Had them sold but none would take them account quality. You must help us make settlement. Shipment came through in fine condition but quality not at all what we bought." On November 25, 1910, defendant answered the telegram of November 23rd, in part, as follows: "We have called up the United States Packing Company this morning and told them of your complaint. They told us that they would let us know this evening what they could do in the matter, but up to this writing we have not heard from them again." In that telegram the defendant further stated that it was willing to send a check for $50 as evidence that it wished to satisfy the plaintiff.

On February 28, 1911, the United States Packing Company wrote the defendant: "We cannot understand how they could make such a loss as that on a car of turkeys. We simply did our part when we packed the car and sold it f.o.b our station, and we delivered just what we promised to deliver * * *." On February 28, 1911, the defendant wrote the plaintiff that it had talked with one Marlowe of the United States Packing Company and that he stated that the Packing Company "had promised to ship the best birds obtainable at that time of the year," and that they had done so. In its letter it further wrote: "As stated in our letter yesterday, we did not consummate the trade with these people until we had investigated

them to our entire satisfaction and when they guaranteed to ship the best quality of birds obtainable, we considered that that was sufficient and, therefore, closed the trade.   *   *   *''

It is contended by the defendant: First, that the evidence does not show that the defendant warranted the quality of the turkeys; second, that the contract effected by the defendant for the purchase of the turkeys from the United States Packing Company was ratified by the plaintiff.

The evidence shows that the plaintiff sought information from the defendant in regard to where turkeys might best be bought; that on October 26, 1910, in a telegram, evidently giving voluntary advice to the plaintiff, the defendant, after advising an immediate order as the market was likely to go higher, used the words, "these guaranteed choice birds." From the context, the reasonable conclusion seems to be that those words had reference to a guaranty by the sellers and not by the defendant. That interpretation is supported by the telegram which was sent on October 26, 1910, which contained the words "but a very poor selection of birds could be purchased at that price and the ones that we are offering you are guaranteed choice quality." The subsequent telegram, that of October 28, 1910, from the defendant to the plaintiff, "Can use one or two cars frozen turkeys as per your telegram," and the telegram of October 29, 1910, in which the defendant telegraphed the plaintiff that it had booked one car turkeys which would be "thoroughly chilled to temperature of car, shipped in barrels   *   *   *   Wire City National Bank, Wichita Falls, Texas, that draft will be paid. Answer," together with the answer of the plaintiff, by wire, "Birds must be choice and routed Burlington and N. P.," and the letter of October 29, 1910, from the defendant to the plaintiff, in which the defendant wrote that upon receipt of plaintiff's order it called up "the

parties offering the turkeys and ascertained from them these are thoroughly chilled before putting into the iced car,'' and that they would guarantee their condition for shipment to the coast, constitute, all taken together, practically all the material evidence of whatever obligations became binding on the defendant to the plaintiff.

It is impossible to read the correspondence and all the material evidence in regard to the obligation of the defendant—all of which lies within the four corners of the letters and telegrams—without being driven to the conclusion that, wherever words were used by the defendant in reference to the quality of the turkeys, they were used as meaning the quality which the seller would agree upon and not the quality which the defendant undertook, itself, to guarantee.

Undoubtedly there is some ambiguity in the phraseology used by the defendant in regard to the alleged guaranty, that the merchandise would be of choice quality, but, after careful analysis, we are of the opinion that, taken altogether and fairly interpreted, it does not sufficiently tend to prove, let alone actually prove, an express promise on the part of the defendant ''that the same would be of choice quality,'' as alleged in the statement of claim.

Further, we are of the opinion that the broker's note, which, on October 29, 1910, the day the contract was consummated, and which made a full and complete disclosure of the terms of the contract, and was forwarded to the plaintiff at Tacoma, where it was received at 3:20 p. m., November 1, 1910, constituted exclusive evidence of the contract made by the defendant for the purchase of the turkeys. *Saladin v. Mitchell*, 45 Ill. 79; *Murray v. J. M. Doud & Co.*, 167 Ill. 368; *Eau Claire Canning Co. v. Western Brokerage Co.*, 213 Ill. 561. Then, too, not only did the plaintiff accept the broker's note as to the terms of the contract, but, subsequently, wired the Texas bank that

the draft covering the shipment, drawn on the United States Packing Company, would be paid. Bearing such facts in mind, it is impossible to avoid the conclusion that even if the defendant did not do what it promised to do, the plaintiff ratified what it did do. Inasmuch, therefore, as the evidence failed to prove that the defendant made any binding promise as to the quality of the turkeys, and, as all the evidence on that subject—consisting entirely of letters and telegrams—places us in such a position that we have the same opportunity of determining the facts in that regard as the jury; and as the evidence shows that the contract of purchase—as shown by the acceptance of the bought-note—was ratified, after full knowledge, by the defendant, we are of the opinion that the plaintiff failed to establish a cause of action, and that the judgment should be reversed.

*Reversed with a finding of fact.*

Finding of fact. That the evidence fails to show that the defendant promised that the merchandise would be of choice quality; that the bought and sold notes constituted the evidence of the contract which was made as to the merchandise; and that the plaintiff by its conduct accepted and ratified the contract so made.

MR. JUSTICE O'CONNOR dissenting.

Defendant was employed by plaintiff to purchase turkeys of choice quality, which defendant agreed to do. Defendant purchased turkeys for plaintiff which defendant said were of choice quality. The turkeys, however, were of inferior quality. The defendant, therefore, breached its agreement, and as a result of such breach plaintiff incurred damages, for which defendant should be held liable.